IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAHD BIN SALIH BIN SULAIMAN AL-JUTAILI, by and through his next friend, SALMAN SALIH AL-JUTAILI,[1]  Petitioners,  v.  GEORGE W. BUSH, DONALD RUMSFELD, ARMY BRIG. GEN. JAY HOOD, and ARMY COL. MIKE BUMGARNER,  Respondents. | No. 1:05 CV 01669 (RWR) |

MEMORANDUM IN SUPPORT OF
MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE THE COURT
AND COUNSEL FOR PETITIONER WITH 30 DAYS' ADVANCE NOTICE OF ANY
REMOVAL OF PETITIONER FROM GUANTÁNAMO

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent authority to impose reasonable conditions to a stay of proceedings, Petitioner Fahd bin Salih bin Sulaiman Al-Jutaili respectfully moves for an order requiring Respondents to provide the Court and counsel for Petitioner with advance notice of any removal of Petitioner from Guantánamo Bay Naval Base in Cuba – the same relief granted by six judges in 25 other Guantánamo detainee cases pending in this District, including Your Honor in six cases. It has been publicly reported that Respondents have removed other detainees from Guantánamo to foreign territories, including a number of detainees transferred to Saudi Arabia who were immediately imprisoned by the Saudi government. Respondents have announced that

---

[1] Petitioners' names were previously misspelled "Fahad Saleh Algatele" and "Salman Saleh Algatele," respectively, on Petitioner's original petition for writ of *habeas corpus*. Counsel for Petitioner have notified Respondents' counsel of the correct spelling and have filed an unopposed motion to modify caption and for leave to amend petition for writ of *habeas corpus* to reflect the correct English spellings of these names.

they intend to transfer other detainees, but they have refused to identify these transferees or to state whether they intend to transfer Petitioner to Saudi Arabia or some other foreign government. Petitioner requests advance notice to enable counsel to contest any such removal from Guantánamo and to preserve the jurisdiction of the Court in this matter.

## STATEMENT OF FACTS

Petitioner Fahd bin Salih bin Sulaiman Al-Jutaili is a Saudi citizen who, on information and belief, has been held unlawfully and virtually incommunicado in Respondents' custody and control at Guantánamo for approximately four years. On August 22, 2005, Petitioner, through his attorneys, filed a petition for writ of *habeas corpus* in this Court. Respondents have not yet filed a factual return. On October 31, 2005, this Court ordered Respondents to file and serve, within 45 days of service of the order, "a statement showing why the Writ of *Habeas Corpus* should not issue." On November 10, 2005, Respondents moved for a stay of proceedings pending the decision of the Court of Appeals for the District of Columbia in *In re Guantánamo Bay Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), and *Khalid v. Bush, Boumediene v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005).

Counsel submitted their applications for security clearance on September 1, 7, and 14, 2005. Three of Petitioner's attorneys received interim clearances within the past week. Accordingly, counsel have not yet been able to meet with Petitioner, and he has not yet had the opportunity to communicate to counsel his own views as to his possible transfer.

A.   **Transfer of Detainees from Guantánamo**

Prior to March 29, 2005, Respondents disclosed that they had transferred 211 detainees from Guantánamo to foreign countries. Sixty-five (65) of those detainees "were provided to foreign governments for ongoing detention." *Abdah v. Bush*, 2005 U.S. Dist. LEXIS 4942, at

2

\*12 (D.D.C. Mar. 29, 2005) (citing declarations by "high-level Department of State and Department of Defense officials"). Four of the detainees were "sent abroad [to Saudi Arabia] on the condition that they continue to be detained." *Abdah v. Bush*, 2005 U.S. Dist. LEXIS 4144, at \*16 (D.D.C. Mar. 12, 2005).

On November 5, 2005, the Department of Defense announced "the release of one [Guantánamo] detainee to Saudi Arabia and the transfer of three detainees to Bahrain." (Dept. of Defense News Release No. 1151-05, Nov. 5, 2005, www.dod.gov/releases/2005/nr20051105-5073.html, attached as Exhibit A.) The Department did not disclose whether these detainees now face further detention in Saudi Arabia and Bahrain. The Department did state that it "expects that there will be other transfers or releases of detainees." (*Id.*) Respondents have not identified which other detainees may be transferred to foreign countries, and Respondents' counsel specifically refused to disclose whether they intend to transfer or "release" Petitioner to Saudi Arabia or another country. (*See* Exhibit M, Declaration of Patricia A. Bronte.) Thus, that information resides exclusively with Respondents. As Judge Collyer noted, "the only way that anyone could know that a transfer is about to happen, *i.e.*, be 'immediate,' is if one is within the chain of command within the federal departments that consult on such matters or if there were information revealed *sotto voce* to a reporter." *Abdah*, 2005 U.S. Dist. LEXIS 4144, at \*16.

**B.     Transfer to Saudi Arabia**

Your Honor noted in a similar case that detainees' concern about transfer to another country with a history of torturing prisoners is not merely "fanciful." *El-Banna v. Bush*, No. 04-1144, at 4 (D.D.C. Apr. 8, 2005). Petitioner's counsel are informed and believe that the United States seeks to transfer detainees from Saudi Arabia, such as Petitioner, to Saudi Arabia or other countries that routinely practice torture. Amnesty International has reported that "[f]ive Saudi

3

Arabian nationals returned to Saudi Arabia from Guantánamo Bay [in 2003] were locked up upon arrival and their legal status remain[ed] shrouded in secrecy" one year later. (Amnesty International USA, "The Gulf and the Arabian Peninsula: Human rights fall victim to the 'War on Terror,'" at 14, June 21, 2004, www.amnestyusa.org/countries/saudi_arabia/ document.do?id, attached as Exhibit B.)

The U.S. government recognizes the danger of torture and abuse to those detained in Saudi Arabia, saying the following in its August 2005 Background Note on Saudi Arabia:

> Despite close cooperation on security issues, the United States remains concerned about human rights conditions in Saudi Arabia. *Principal human rights problems include abuse of prisoners and incommunicado detention.*

(U.S. Department of State, *Background Note: Saudi Arabia*, http://www.state.gov/r/pa/ei/bgn/3584.htm, emphasis added, attached as Exhibit C.) In its 2003 Country Report on Human Rights Practices in Saudi Arabia, the State Department stated:

> [T]here were credible reports that the authorities abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of torture, including allegations of beatings with sticks and suspension from bars by handcuffs. There were reports that torture and abuse were used to obtain confessions from prisoners.

(U.S. Department of State, *Country Reports on Human Rights Practices 2003: Saudi Arabia,* http://www.state.gov/g/drl/rls/hrrpt/2003/27937.htm, attached as Exhibit D.) In 2005, the State Department reiterated its concern about Saudi torture and abuse of prisoners, also noting that:

> During [2004], the Mutawwa'in [religious police] harassed, abused, and detained citizens and foreigners of both sexes. . . . Mutawwa'in abuses continued during the year, despite an initial decrease following the May 2003 terrorist attacks.

4

(U.S. Department of State, *Country Reports on Human Rights Practices 2004: Saudi Arabia,* http://www.state.gov/g/drl/rls/hrrpt/2004/41731.htm, attached as Exhibit E.)

**C.     Rendition and "Black Sites"**

Recent news accounts state that the United States has secretly transferred detainees to countries that routinely practice torture, without complying with the applicable legal requirements for extradition. (Dana Priest, "CIA Holds Terror Suspects in Secret Prisons," *Wash. Post*, Nov. 2, 2005, at A1, attached as Exhibit F.) This practice, known as "rendition" or "extraordinary rendition," is used to facilitate interrogation by subjecting detainees to torture. (*See* Jane Mayer, "Outsourcing Torture: The Secret History of America's 'Extraordinary Rendition' Program," *The New Yorker,* Feb. 14, 2005, at 106, attached as Exhibit G.) The U.S. government's practice of rendition has been documented by various major American news organizations, including the *Washington Post* and the *New York Times*. According to news accounts,

> Since September 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries, . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics -- including torture and threats to families -- that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogations, the sources said.

(Rajiv Chanrasekaran and Peter Finn, "U.S. Behind Secret Transfer of Terror Suspects," *Wash. Post*, Mar. 11, 2002, at A1, attached as Exhibit H; Stephen Grey and Don Van Natta, Jr., "In Italy, Anger at U.S. Tactics Colors Spy Case," *NY Times*, June 26, 2005 ("The United States . . . has frequently used other means [of countering terrorism] since Sept. 11, 2001, including renditions – abducting terror suspects from foreign countries and transporting them for

5

questioning to third countries, some of which are known to use torture."), attached as Exhibit I; *see also* Dana Priest, "Long Term Plan Sought for Terror Suspects," *Wash. Post*, Jan. 2, 2005, at A1 ("The transfers, called 'renditions,' depend on arrangements between the United States and other countries, such as Egypt . . ., that agree to have local security services hold certain suspects in their facilities for interrogation by CIA and foreign liaison officers."), attached as Exhibit J.) The risk of torture by foreign governments is heightened because the Respondents have consistently, but incorrectly, described the Guantánamo detainees as "the worst of the worst." (PBS, "Frontline: The Torture Question," remarks of Lt. Col. Thomas Berg, www.pbs.org/wgbh/pages/frontline/torture/themes/gitmo.html, attached as Exhibit K.)

On November 2, 2005, the *Washington Post* reported that for almost four years, the CIA has been operating a "covert prison system" of overseas detention facilities – called "black sites" – while "keeping even basic information about the system secret from the public, foreign officials and nearly all members of Congress charged with overseeing the CIA's covert actions." (Exhibit F.) Government intelligence officials reportedly defend the black sites because they provide the CIA with locations to "hold and interrogate suspected terrorists for as long as necessary and without restrictions imposed by the U.S. legal system or even by the military tribunals established for prisoners held at Guantánamo Bay." (*Id.*) According to the *Washington Post*, interrogators at the black sites "are permitted to use the CIA's approved 'Enhanced Interrogation Techniques,' some of which are prohibited by the U.N. convention [against torture and other cruel, inhuman or degrading treatment or punishment] and by U.S. military law," including "waterboarding," *i.e.*, inducing a prisoner to believe that he is drowning. (*Id.*) The German newspaper *Spiegel* confirmed these reports by stating that "Czech Interior Minister František Bublan admitted American intelligence officials asked a month ago if several people

6

could be flow[n] in from Guantánamo Bay in Cuba for 'secure asylum,' but Prague turned down the request." ("The CIA's 'Black Sites:' Guantánamos in Europe?," *Spiegel Online*, Nov. 7, 2005, service.spiegel.de/cache/international/0,1518,druck-383670,00.html, attached as Exhibit L.)

## ARGUMENT

The advance notice requested in this motion is supported by three independent grounds. First, the All Writs Act, 28 U.S.C. § 1651(a), recognizes the Court's inherent power to preserve its own jurisdiction. Second, advance notice of any intended transfer of Petitioner to a foreign jurisdiction would serve the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004). Third, the Court has the inherent authority to condition the stay requested by Respondents on measures that would maintain Petitioner's access to this Court.

Six judges of this District, including Your Honor, have granted the relief requested by this Petitioner in 25 other Guantánamo detainee cases. As a condition of staying the proceedings, Your Honor ordered Respondents in six cases to provide advance notice of transfers: *Ahmed v. Bush*, 2005 U.S. Dist. LEXIS 14024 (July 8, 2005); *Al Daini v. Bush*, No. 05-634 (June 6, 2005); *Adem v. Bush*, No. 05-0723 (June 6, 2005); *El-Banna v. Bush*, No. 04-1144 (Apr. 8, 2005); *Abdullah v. Bush*, No. 04-23 (Apr. 8, 2005); and *Al Rashaidan v. Bush*, No. 05-586 (Apr. 8, 2005). Judge Urbina also applied the same rationale in six cases: *Amir v. Bush*, No. 05-1724 (Oct. 5, 2005); *Hatim v. Bush*, No. 05-1429 (Aug. 22, 2005); *Al-Hela v. Bush*, No. 05-1048 (June 3, 2005); *Tumani v. Bush*, No. 05-526 (Apr. 6, 2005); *Qayed v. Bush*, No. 05-454 (Apr. 6, 2005); and *Al-Oshan v. Bush*, No. 05-520 (Mar. 31, 2005). In two cases, Judge Huvelle has ordered Respondents under the All Writs Act to provide advance notice of any intended

7

transfer of detainees, unless Respondents have "reached a diplomatic understanding with the transferee country that a petitioner's transfer from Guantánamo is for release only." *Kurnaz v. Bush* and *Ameziane v. Bush*, 2005 U.S. Dist. LEXIS 6560, at *9 (Apr. 12, 2005). Judge Kennedy granted preliminary injunctions in three cases to require Respondents to provide 30 days' advance notice before "transporting or removing any of Petitioners from Guantánamo Bay Naval Base." *Abdah v. Bush*, 2005 U.S. Dist. LEXIS 4942, at *24 (Mar. 29, 2005); *Anam v. Bush*, No. 04-1194 (May 9, 2005); *Al-Mohammed v. Bush*, No. 05-247 (Mar. 30, 2005). Similarly, Judge Kessler granted preliminary injunctions on the advance notice issue in four cases: *Alhami v. Bush*, No. 05-359 (June 9, 2005); *Al-Adahi v. Bush*, No. 05-280 (Apr. 28, 2005); *Al-Joudi v. Bush*, 2005 U.S. Dist. LEXIS 6265 (Apr. 4, 2005), involving four Saudi Arabian detainees, and *Al-Marri v. Bush*, 2005 U.S. Dist. LEXIS 6259 (Apr. 4, 2005), involving a detainee from Qatar. In three cases, Judge Friedman relied on Judge Kennedy's decision in *Abdah* and Judge Urbina's decision in *Al-Oshan* in ordering Respondents to provide advance notice of transfers of detainees. *Al-Shiry v. Bush*, No. 05-490 (Apr. 1, 2005); *Al-Wazan v. Bush*, No. 05-329 (Apr. 1, 2005); *see also Mokit v. Bush*, No. 05-0621 (June 16, 2005). In a fourth case, Judge Friedman ordered advance notice of transfer *sua sponte*, in response to the detainee's motion for a preliminary injunction prohibiting rendition. *Paracha v. Bush*, No. 04-2022 (June 16, 2005).[2]

---

[2] Three judges of this District, including Your Honor, have also granted temporary restraining orders enjoining Respondents from transferring detainees until their preliminary injunction motions are decided. *Alladeen v. Bush*, No. 05-0833 (Oct. 27, 2005); s*ee also Zakirjan v. Bush*, No. 05-2053 (Nov. 7, 2005) (Kennedy, J.); *Abdah v. Bush*, 2005 U.S. Dist. LEXIS 4144 (Mar. 12, 2005) (Collyer, J.). On March 12, 2005, Judge Collyer granted a TRO to 14 Yemeni detainees in *Abdah*, partially in reliance on a *New York Times* report of a Defense Department plan "to transfer more than half of the GTMO detainees to prisons in Saudi Arabia, Afghanistan, and Yemen." But, the next day, Judge Collyer denied a similar TRO motion purportedly filed on behalf of every single Guantánamo detainee, noting the "conspicuous[] absen[ce of] sufficient evidence that any of the Petitioners . . . could be at risk of an immediate transfer and continued indeterminate detention." *Does 1-570 v. Bush*, 2005 U.S. Dist. LEXIS 6417, at *8-9.

To the best of our knowledge, four judges of this District have denied motions for advance notice of transfer in Guantánamo detainee cases. Judge Walton denied the request for a preliminary injunction requiring 30 days' advance notice of transfer, but "require[d] the respondents to submit a declaration to this Court advising it of any transfers and certifying that any such transfers or repatriations were not made for the purpose of merely continuing the petitioners' detention on behalf of the United States or for the purpose of extinguishing this Court's jurisdiction over the petitioners' actions for habeas relief for a reason unrelated to the decision that the petitioners' detention is no longer warranted by the United States." *Almurbati v. Bush*, 366 F. Supp. 2d 72, 73-74, 77 (Apr. 14, 2005) (noting that "the DoD represents that 'of the over [200] transfers, both for release and for continued detention . . ., those have all been repatriations back to the home country.'"). Similarly, Judge Collyer denied four detainees' motion for advance notice of transfer, but nevertheless ordered Respondents to give the Court 30 days' advance notice before transferring the Libyan-born detainee to his home country. *Deghayes v. Bush*, No. 04-2215 (June 14, 2005). Judge Walton also relied on his reasoning in *Almurbati* to deny a detainee's motion for notice of transfer, *Battayav v. Bush*, No. 05-714 (May 3, 2005), but did not require Respondents to submit to the Court the declaration and certification required in *Almurbati* – apparently because Respondents already had an ongoing obligation to notify the Court of any change in circumstances.[3]

Relying on denials by government officials of any intent to circumvent the court's jurisdiction or to transfer detainees for ongoing detention in foreign countries, Judge Bates denied preliminary injunctions in four cases. *Al-Shabany v. Bush*, No. 05-2029 (Nov. 17, 2005);

---

[3] Judge Leon also denied a detainee's preliminary injunction motion, but instead of requesting advance notice of transfer, the detainee had sought a blanket prohibition on transfer to Egypt. *Sliti v. Bush*, 2005 U.S. Dist. LEXIS 18888, at *2 (Aug. 30, 2005).

9

*Zaid v. Bush*, No. 05-1646 (Oct. 25, 2005); *O.K. v. Bush*, 377 F. Supp. 2d 102; *Al-Anazi v. Bush*, 370 F. Supp. 2d 188. In *Al-Anazi*, Judge Bates simultaneously denied a preliminary injunction regarding advance notice and granted Respondents' request for a stay of proceedings. The petitioners apparently did not request advance notice as a condition of granting the stay. *See id.* at 192-93. Judge Lamberth relied on Judge Bates's ruling in *Al-Anazi* to reach the same result in *Attash v. Bush*, No. 05-1592 (Sept. 1, 2005).

Thus, the majority of judges in this District have determined, in the majority of Guantánamo detainee cases, that Respondents should be required to provide advance notice to the Court and counsel for the detainee before transferring the detainee to a foreign country.

**I.      The Court Should Preserve Its Jurisdiction Under The All Writs Act.**

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Environmental Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Although courts in this District have differed on the question of whether the Guantánamo detainees possess any constitutional rights, the Supreme Court has conclusively determined that this Court has jurisdiction to decide that question. *See Rasul v. Bush*, 542 U.S. 466, 124 S. Ct. 2686, 2698 (2004). As Your Honor has noted, however, Respondents have admitted in similar cases that they transferred detainees and then claimed that the transfers deprived the court of jurisdiction. *See, e.g., El-Banna v. Bush*, No. 04-1144, at 4 (D.D.C. Apr. 8, 2005) (Roberts, J.). Accordingly, this Court should act to prevent Respondents from circumventing the Court's jurisdiction by transferring Petitioner to a foreign territory.

Judges Huvelle and Kessler have already held that the All Writs Act authorizes the Court to order Respondents to provide advance notice of their intent to transfer detainees to detention

10

CHICAGO_1339297_2

in a foreign country. *Kurnaz v. Bush* and *Ameziane v. Bush*, 2005 U.S. Dist. LEXIS 6560, at *9 (D.D.C. Apr. 12, 2005) (Huvelle, J.); *Al-Marri v. Bush*, 2005 U.S. Dist. LEXIS 6259, at *14 n.11 (D.D.C. Apr. 4, 2005) (Kessler, J.). Counsel for Kurnaz had met with his client prior to moving for this relief, but detainee Ameziane did not even know that he was represented by counsel. 2005 U.S. Dist. LEXIS 6560, at *2. In reasoning that is equally applicable to this case, the court noted that it had "jurisdiction to determine the legality of the ongoing detention of petitioners held in Guantánamo Bay." *Id.* at *4-5. The court held that it "must also have authority to preserve this jurisdiction if it can be shown that respondents are acting to circumvent it." *Id.* at *5. As they have consistently done in the Guantánamo detainee cases, Respondents in *Kurnaz* and *Ameziane* took the position that the court would lose its jurisdiction once the detainees are transferred to the custody of a foreign government. *Id.* at *6. As a condition of entering the stay requested by Respondents, the court ordered the "limited remedy of advance notice:"

> [W]here respondents do not have an understanding with the receiving country that a transfer from Guantánamo Bay, Cuba is for purposes of release only, respondents shall provide petitioner's counsel with thirty (30) days advance notice of the transfer, including the proposed destination and conditions of transfer.

*Id.* at *9.

II.     **Preliminary Injunctive Relief Is Warranted To Prevent Respondents From Transferring Petitioner To A Foreign Country Without Advance Notice.**

Each of the four factors for awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) Respondents will suffer no harm if the injunction is granted; (3) Petitioner is likely to succeed on the merits of his claims; and (4) there is a clear public interest in preventing the United States Government from transferring Petitioner to a foreign country for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 and n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158

F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Petitioner stands to suffer immeasurable and irreparable harm — from torture to possible death — at the hands of a foreign government like Saudi Arabia.  Transfer to another country, even if "only" for continued imprisonment, could also impede Petitioner's right to adjudication by this Court of the legality of his detention.  Each of these circumstances poses the threat of irreparable harm.  *See Al-Marri*, 2005 U.S. Dist. LEXIS 6259, at *12-14.  By contrast, Respondents, who have already held Petitioner for years, are asked only to provide counsel and the Court with adequate notice of any intended removal of Petitioner from Guantánamo.  Respondents can suffer no conceivable harm from complying with such a request.  As Judge Kessler noted,

> The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper.  Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioner's claims before this Court.

*Id.* at *19-20.

Petitioner has raised serious and substantial issues as to his entitlement to relief that are "a fair ground for litigation." *Id.* at *16.  Although the petition for writ of *habeas corpus* raises issues on which the judges of this District disagree and which the Supreme Court will likely be called upon to decide, *Al-Joudi*, 2005 U.S. Dist. LEXIS 6265, at *16, Petitioner here need only show a likelihood of success "in blocking a transfer made [to a foreign country] absent notice to, and approval from, the court." *Abdah*, 2005 U.S. Dist. LEXIS 4942, at *17.  Petitioner is likely to succeed in making this showing.  The Supreme Court has already held that the Court has jurisdiction of *habeas* claims by detainees like Petitioner, *Rasul v. Bush*, 542 U.S. 466, 124 S. Ct.

12

2686, 2698 (2004), and according to Respondents, the Court would lose jurisdiction if Petitioner were transferred to a foreign country. In addition, any transfer of Petitioner without leave of this Court would contravene Fed. R. App. Proc. 23(a), which prohibits a custodian from transferring a *habeas corpus* petitioner to the custody of another while review of a *habeas* decision is pending. *Abdah*, 2005 U.S. Dist. LEXIS 4942, at *15-17.

In addition to the foregoing, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended transfer of Petitioner to a foreign country. No matter how confident Respondents may be that their actions are lawful, the public good requires that a federal litigant — properly before the Court and represented by counsel — be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely. *Id.* at *22 ("[T]he public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process[.]").

### III.  The Court Has The Inherent Authority To Condition The Stay of Proceedings On Advance Notice That Would Preserve The Status Quo.

"Coextensive with the district court's inherent power to stay proceedings is the court's power to craft a stay that balances the hardships to the parties." *Al-Oshan*, No. 05-520, at 2. In this case, the Court should condition the grant of Respondents' motion to stay proceedings on a requirement that Respondents provide advance notice to the Court and Petitioner's counsel of any intended removal of Petitioner from Guantánamo. As Your Honor explained:

> A primary purpose of a stay pending resolution of the issues on appeal is to preserve the status quo among the parties. . . . A court may, in appropriate situations, specify protective conditions in balancing the hardship necessarily imposed on the party whose suit . . . has been stayed pending appeal. . . . Where, as here, the condition imposed on the proponent of the stay is "neither heavy nor unexpected," imposing a protective condition is well within a court's discretion.

13

CHICAGO_1339297_2

*Ahmed*, 2005 U.S. Dist. LEXIS 14024, at *2-3 (citations omitted).  In this case, as in *Ahmed*, imposing on Respondents the condition of advance notice of Petitioner's transfer is "neither heavy nor unexpected."  On the contrary, it merely requires Respondents to "file a few pieces of paper."  *Al-Marri*, 2005 U.S. Dist. LEXIS 6259, at *19-20.  Under these circumstances, the Court should condition the stay of proceedings on Respondents' advance notice of any transfer of Petitioner to a foreign country.

## CONCLUSION

For all the reasons set forth above, Petitioner respectfully asks the Court to condition the Respondents' request for a stay on the entry of an Order requiring the Respondents to give the Court and Petitioner's counsel 30 days' advance notice of any removal of Petitioner from Guantánamo Bay so that counsel can contest any such removal and act to preserve the jurisdiction of the Court in this matter.  Petitioner is submitting two versions of a draft order: one that is similar to the order previously entered by Your Honor in *Ahmed*, and a second draft order that contains additional factual findings.

Respectfully submitted,

\_\_\_/s/ Daniel Mach_____            Dated:  November 18, 2005
One of the Attorneys  for Petitioner

| | |
|---|---|
| Thomas P. Sullivan | Daniel Mach (Admitted in D.D.C.) |
| Jeffrey D. Colman | JENNER & BLOCK LLP |
| David J. Bradford | 601 Thirteenth Street, N.W., Suite 1200 |
| Patricia A. Bronte | Washington, D.C.  20005-3823 |
| Wade A. Thomson | Tel: (202) 639-6000 |
| Maya D. Nath | Fax: (202) 639-6066 |
| JENNER & BLOCK LLP | |
| One IBM Plaza | |
| Chicago, IL  60611 | |
| Tel: (312) 923-9350 | |
| Fax: (312) 527-0484 | |

CHICAGO_1339297_2

*Of Counsel*
Barbara Olshansky (BO3635)
Tina Monshipour Foster (TF5556)
Gitanjali S. Gutierrez (GG1234)
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6464
Fax: (212) 614-6499

15