**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ZIYAD BIN SALIH BIN MUHAMMAD AL-BAHOOTH, et al., <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | Civil Action No. 05-1666 (ESH) |
| RASHID AWADH RASHID AL-UWAIDAH, et al., <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | Civil Action No. 05-1668 (GK) |
| FAHAD SALEH ALGATELE, et al., <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, et al., <br><br> Respondents. | Civil Action No. 05-1669 (TFH) |

**RESPONDENTS' OPPOSITION TO PETITIONERS'
MOTIONS FOR PRELIMINARY INJUNCTIONS REQUIRING
ADVANCE NOTICE OF TRANSFER OR RELEASE**

Petitioners in the above-represented cases, each represented by the same counsel,

simultaneously filed virtually identical motions for preliminary injunctions prohibiting

respondents from repatriating, releasing, or transferring them from Guantanamo Bay Naval Base without providing thirty days advance notice to the Court and counsel.  In the interest of efficiency, respondents respond to the motions in this consolidated fashion, and oppose the motions for the reasons set forth below.[1]

## BACKGROUND

### A.    Detention of Enemy Combatants at Guantanamo

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported it.  In the course of those hostilities, the United States has captured or taken custody of a number of foreign nationals as enemy combatants, some of whom are being held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

---

[1] Similar motions have been filed over the past nine months in numerous other Guantanamo detainee habeas cases, with varying results.  Compare, e.g., El-Mashad v. Bush, Civ. A. No. 05-270 (JR), Order dated April 7, 2005 ( prohibiting transfer or release as part of stay of proceedings); Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005) (granting preliminary injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31, 2005) (ordering advance notice as part of stay), with Deghayes v. Bush, Civ. A. No. 04-2215 (RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court of any decision to transfer a particular individual to a particular country), with Almurbati v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op. (D.D.C. May 2, 2005) (same); Attash v. Bush, Civ. A. No. 05-1592 (RCL), slip op. (D.D.C. Sept. 1, 2005) (same).  Respondents have taken interlocutory appeals of the orders requiring advance notice.  No order denying advance notice has been appealed.

**B.      Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  <u>See</u> Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of Ambassador

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[2]  The Department of Defense

("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether

continued detention is warranted based on factors such as whether the detainee continues to pose

a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those

annual reviews include those currently being conducted through Administrative Review Boards.

<u>See</u> Waxman Decl. ¶¶ 3, 7.[3]  As part of the Administrative Review Board process, counsel who

represent detainees have been invited to make written submissions concerning whether further

detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised,

---

[2] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases.  <u>See</u> Waxman Decl. ¶ 1.  The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in <u>Abdah</u>, Civ. A. No. 04-1254 (HHK), and Ambassador Prosper left office on or about October 11, 2005, but the policies and practices set forth in his March 8 declaration remain in effect and are applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  <u>See</u> <u>infra</u> note 4.

[3] <u>See</u> <u>generally</u> Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, <u>available at</u> <<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, <u>available at</u> <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government. Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7. Almost 250 Guantanamo detainees have been so transferred, over a period spanning several years. Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.[4]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving

---

[4] As an update to certain information provided in the attached declarations, at last count, 256 detainees have been transferred by the Defense Department from Guantanamo, of which 180 were transferred for release. See Department of Defense Press Release, "Detainee Transfer Announced," Nov. 5, 2005, available at <<http://www.defenselink.mil/releases/>>.

government.  Waxman Decl. ¶ 5.  The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies.  Id.  In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States.  Id.  Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the Department of Defense to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States

Government considers necessary and appropriate for the country in question, including

assurances of humane treatment and treatment in accordance with the international obligations of

the foreign government accepting transfer.  Id.  Among other things, the Department of State

considers whether the nation in question is a party to relevant treaties such as the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues

more specific assurances if the nation concerned is not a party or other circumstances warrant.

Id.

The determination whether it is more likely than not an individual would be tortured by a

receiving foreign government, including, where applicable, evaluation of foreign government

assurances, involves senior level officials and takes into account a number of considerations,

including whether the nation concerned is a party to certain treaties; the expressed commitments

of officials of the foreign government accepting transfer; the particular circumstances of the

transfer, the country, and the individual concerned; and any concerns regarding torture that may

arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are

developed through a process involving the Bureau of Democracy, Human Rights, and Labor

(which drafts the State Department's annual Country Reports on Human Rights Practices) and

the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl.

¶ 7.  When evaluating the adequacy of assurances, State Department officials consider the

identity, position, or other information concerning the official relaying the assurances; political or

legal developments in the foreign country concerned that provide context for the assurances; and

the foreign government's incentives and capacity to fulfill its assurances to the United States.

Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring

mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where the Department of Defense decided not to transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[5]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result,

---

[5] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper

(continued...)

disclosure could impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts related to the war

on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

## I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton,

391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a

movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would

suffer irreparable injury if the injunction is not granted, 3) that an injunction would not

substantially injure other interested parties, and 4) that the public interest would be furthered by

the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction

"must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against

something merely feared as liable to occur at some indefinite time; the party seeking injunctive

relief must show that the injury complained of is of such imminence that there is a clear and

_____

[5](...continued)
Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and
interfere with the ability of our foreign relations personnel to interact effectively with foreign
state officials.  Id.

present need for equitable relief to prevent irreparable harm." Id. (citations and internal

quotation marks omitted; emphasis in original).[6]

## II.    PETITIONERS FAIL TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Some Judges of this Court have required advance notice of any transfer through a

preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction,

reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and

curtail the Court's review of the legality of his detention.  Respondents respectfully suggest that

these decisions rest on faulty logic.  The ultimate relief sought by petitioners in these habeas

cases is obviously release from custody.  Any right to challenge the legality of one's detention

through a habeas proceeding cannot reasonably extend so far as to require that detention be

continued, after the Executive determines that the military rationales for enemy combatant

detention no longer warrant such custody, for no reason other than to be able to test the

legitimacy of detention the Executive no longer is interested in maintaining.[7]  "The ultimate

---

[6] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  However, as one Judge of this Court has concluded, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay."  Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).  Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioners seek might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.

[7] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October

(continued...)

objective of a habeas petition is release from custody." Almurbati, 366 F. Supp. 2d at 78. As one Judge of this Court stated, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction." Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners." (citation omitted)).

That release from United States custody will give petitioners all the relief they can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, a former detainee may be taken into custody and detained in the receiving country based on that country's independent interests and determinations. As respondents' declarations make clear, when the Department of Defense transfers detainees to the control of other governments, the detainees are no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's independent decision, based on its domestic laws, that the individual should be detained. Waxman Decl. ¶ 5. Indeed, even if the United States transfers a detainee to his home

_____

[7](...continued)
2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court. Waxman Decl. ¶ 4. It has been noted that 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts." Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 3 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of this and most other detainee habeas petitions).

government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws.  The Court should therefore reject petitioners' suggestion that the possibility of future detention in an individual's home or another country based on that country's independent interests and determinations constitutes irreparable injury warranting an injunction.

      **B.**     **Speculation that the United States Will Defy its Own Policy by Transferring Detainees to Countries in Circumstances Where it is Believed They Will be Tortured Does Not Warrant a Preliminary Injunction**

       Nor can petitioners carry their burden to show irreparable injury that is "certain and great . . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by rife speculation that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send petitioner to a foreign country in circumstances where he will be tortured.  Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  This policy is implemented through a process that contains several levels of precautions and safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to assume, without any evidence, that the United States' policy and practice is somehow a sham or pretext.  There is no valid basis for such an assumption.

       Rather, as one Judge of this Court has found, respondents' sworn declarations "directly

refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78. Moreover, another Judge found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases – including petitioners here – failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196.  Thus, petitioners have failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

**III.    PETITIONERS CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS**

Petitioners fare no better on the second prong of the preliminary injunction analysis, which requires them to show that they are likely to succeed, following notice, in preventing a transfer from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.), and of petitioners' claims that they are being wrongfully detained, it is not the likelihood of success on those issues or claims that matters for purposes of the instant motion for preliminary

injunction.  Rather, as two Judges of this Court (who reached opposite outcomes on the bottom

line of whether to require advance notice) have agreed, the likelihood of success analysis must

focus on the legal basis for petitioners to obtain an order preventing <u>termination</u> of detention by

the United States in the manner described in the declarations submitted herewith.  <u>See</u> <u>Al-Anazi</u>,

370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's

<u>detention</u> does not at all imply that there exists a sound basis to challenge the legality of one's

<u>transfer</u>.  Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim

for preliminary injunctive relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not

to their <u>detention</u> at Guantanamo (emphasis in original)); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u>

there are no circumstances under which Petitioners could obtain a court order preventing a

contemplated transfer, a preliminary injunction should not be granted" (emphasis in original)).

Petitioners fail to identify any valid source of legal authority for such an order.

Moreover, even if such a source existed, the Rule of Non-Inquiry, which bars judicial inquiry

into the fairness of a foreign nation's justice system and the procedures or treatment that an

individual may experience in a foreign nation, weighs heavily against petitioners' likelihood of

success in contesting a transfer or repatriation.

> ### A.    No Valid Legal Basis Exists for a Judicial Order
> ### Enjoining Transfer or Repatriation of an Individual
> ### Previously Detained by the United States as an Enemy Combatant

The only legal basis that petitioners advance for blocking a transfer is that "the Court

would lose jurisdiction if Petitioner were transferred to a foreign country."  Petrs' Mems. at 12.

According to petitioners' theory, the mere existence of jurisdiction over this habeas case under

<u>Rasul v. Bush</u>, 124 S. Ct. 2686 (2004), suffices, in and of itself, to automatically make any

transfer forbidden.  This theory is misplaced.  As discussed above in the context of irreparable

harm, see supra Section II.A, protection of the Court's jurisdiction is not an appropriate legal

rationale for an order forbidding transfer or repatriation of an individual detained at Guantanamo,

because relinquishment from United States custody (which occurs in every such transfer or

repatriation) represents the full extent of relief that petitioners could obtain in habeas.  See

Almurbati, 366 F. Supp. 2d at 80 ("[O]nce the respondents release the petitioners from United

States custody . . . they will have obtained the result requested and at that point there will be no

further need for this Court to maintain jurisdiction."); see also Al-Anazi, 370 F. Supp. 2d at 198.[8]

Indeed, it has been noted that, "[w]ere the Court to preserve its jurisdiction over the habeas

petitions, and ultimately determine that the United States may no longer detain the petitioners,

the parties and the Court would find themselves in precisely the same position in which they find

themselves now – with the respondents taking steps to transfer those individuals out of United

States control, and the petitioners compelled to come forward with some legal or evidentiary

basis to prevent transfer to an 'undesirable' country."  Al-Anazi, 370 F. Supp. 2d at 196.  Thus,

petitioners do not enjoy a likelihood of success in obtaining an order barring a transfer in order to

---

[8] This proposition has been criticized as "overly simplistic" because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody."  Al-Marri v. Bush, Civ. A. No. 04-2035 (GK), 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioners may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

"protect" the Court's jurisdiction.[9]

### B.    Separation-of-Powers Principles Militate Heavily Against Petitioners' Likelihood of Success

Further, even if some valid claim or other legal basis existed for judicial involvement in transfer or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice requirement to support and facilitate such involvement, the separation of powers would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our

---

[9]  Petitioners also briefly allude to Federal Rule of Appellate Procedure 23(a), contending that a transfer of any of the petitioners herein would violate that rule.  Petrs' Mems. at 12-13. Petitioners fail to articulate any explanation of how Fed. R. App. P. 23(a) would govern any of these cases, in which there has not been any decision that is undergoing appellate review.  See Fed. R. App. P. 23(a) (applying "[p]ending review of a decision in a habeas corpus proceeding" and only to "the prisoner" in whose proceeding that decision was made); see also Fed. R. App. P. 1(a)(1) ("These rules govern procedure in the United States courts of appeals."); Order dated May 3, 2005, in Battayav v. Bush, Civ. A. No. 05-714 (RBW) (D.D.C.), at 1 n.1 (rejecting Fed. R. App. P. 23(a) argument in case that, like this one, did not have a pending appeal); Al-Anazi, 370 F. Supp. 2d at 199 n.11 ("The Court notes that petitioners did not even attempt to argue in their papers that Federal Rule of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners' habeas petition is not presently on appeal.").  In any event, Fed. R. App. P. 23(a) does not require notice of a transfer that constitutes a complete relinquishment of custody, as in the case of return of wartime alien detainees to their own countries, and petitioners' novel attempted use of the rule must be rejected as it "would transform a technical and procedural rule that addresses the identity of the parties in a habeas proceeding into a sweeping prohibition on the transfer and release of military detainees while a case is on appeal."  O.K. v. Bush, 377 F. Supp. 2d 102, 117 (D.D.C. 2005) (citing Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988)).

international relations.'") (quoting <u>Romero v. International Terminal Operating Co.</u>, 358 U.S.

354, 383 (1959)).[10]  If the Court were to entertain petitioners' claims to a right to contest

repatriation or removal from Guantanamo, it would insert itself into the most sensitive of

diplomatic matters.  Judicial review of a transfer or repatriation decision could involve scrutiny

of United States officials' judgments and assessments on the likelihood of torture in a foreign

country, including judgments on the reliability of information and representations or the

adequacy of assurances provided, and confidential communications with the foreign government

and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters

could chill important sources of information and interfere with our ability to interact effectively

with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign

government in question, as well as other governments, would likely be reluctant to communicate

frankly with the United States in the future concerning torture and mistreatment concerns.

Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in

the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

 Because of these foreign relations implications, as developed most extensively in the

analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a

requesting nation's justice system'" and "'the procedures or treatment which await a surrendered

---

[10] In <u>Holmes</u>, U.S. citizen servicemembers sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. <u>citizens</u>, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459
F.2d at 1225.

fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.

1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));

see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "counsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial

for an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

laws and the manner in which they are enforced."  Id. at 1067.  "It is the function of the Secretary

of State to determine whether extradition should be denied on humanitarian grounds."  Id.

Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of

Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61

(E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to

Albania were solely for the Secretary of State to weigh, and not an appropriate subject for

judicial inquiry), on appeal, No. 05-3149 (3d Cir.).  See generally Jacques Semmelman, Federal

17

Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings,

76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioners seeks judicial

review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely

trying to block an extradition.  The considerations that underlie the Rule of Non-Inquiry are not

endemic to the specific context of extradition, but instead rest on the constitutional separation of

powers.[11]  See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995)

("Undergirding this principle is the notion that courts are ill-equipped as institutions and

ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into

and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F.

Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has

---

[11] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision.  Kin-Hong, 110 F.3d at 111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioners may contend that the only possible way to repatriate them would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23

(holding, in a non-extradition context, that considerations similar to those embodied in the Rule

of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a

foreign nation's trial of a U.S. citizen).  Thus, petitioners cannot turn to the courts to second-

guess Executive judgments about matters such as custodial conditions and/or the adequacy of

legal procedures in a foreign country, as well as the credibility and adequacy of a foreign

government's assurances.  Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of

courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor

responsibility and have long been held to belong in the domain of political power not subject to

judicial intrusion or inquiry'" (quoting Chicago & Southern, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming

transfer or repatriation in order to enable petitioners to seek a judicial order blocking it.  Neither

the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of

ordering custody that the United States wishes to relinquish to nevertheless be artificially and

indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the

absence of affirmative legal authority, separation of powers considerations and foreign relations

sensitivities preclude a judicial inquiry in which this Court would substitute its judgment

regarding the appropriateness of repatriation for that of the appropriate Executive Branch

officials.

IV.     **AN INJUNCTION REQUIRING ADVANCE NOTICE
        WOULD TRAMPLE ON THE SEPARATION OF POWERS**

It is undisputed that the sole reason petitioners seek advance notice is to enable them to

seek an order blocking or changing a transfer or repatriation decision that the Executive would

already have made after consultation and coordination with the foreign government in question.

See, e.g., Petrs' Mems. at 2 (conceding that the purpose of the advance notice is "to enable

counsel to contest any such removal from Guantanamo").  Such an advance notice requirement

foreshadows judicial review and intervention that would be accompanied by the attendant harms

discussed in the declarations of Deputy Assistant Secretary Waxman and then Ambassador

Prosper submitted herewith.  See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Even if such

judicial review did not ultimately result in an injunction against transfer, the mere inquiry into

the United States' dialogue with foreign nations and into the terms of a transfer and any

assurances that may have been obtained would cause grave harm.  See supra Section III.B

(describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman

Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as

exemplified by an advance notice requirement, causes separation-of-powers harm by

undermining the ability of the Executive Branch to speak with one voice in its dealings with

foreign nations.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000)

(expressing disapproval of acts that "compromise the very capacity of the President to speak for

the nation with one voice in dealing with other governments").  An advance notice requirement,

after all, would make the results of diplomatic dialogue between the Executive Branch and a

foreign government regarding repatriations or transfers inherently contingent because the

20

effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or

repatriation to go forward, and such a requirement would also inject delays into future transfers.

These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion

within its constitutional sphere of responsibility.[12]  Indeed, as a Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioners' motions

---

[12] While two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Marri, 2005 WL 774847, at *6; Abdah, 2005 WL 711814, at *6, that formulation merely begs the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or imminent here and stand to be prevented by an injunction.  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioners may have, constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

for preliminary injunctions be denied.

Dated: November 29, 2005                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            KENNETH L. WAINSTEIN
                                            United States Attorney

                                            DOUGLAS N. LETTER
                                            Terrorism Litigation Counsel


                                               /s/ Robert J. Katerberg
                                            JOSEPH H. HUNT (D.C. Bar No. 431134)
                                            VINCENT M. GARVEY (D.C. Bar No. 127191)
                                            TERRY M. HENRY
                                            JAMES J. SCHWARTZ
                                            PREEYA M. NORONHA
                                            ROBERT J. KATERBERG
                                            ANDREW I. WARDEN
                                            NICHOLAS J. PATTERSON
                                            Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., N.W.
                                            Washington, DC  20530
                                            Tel:  (202) 514-4107
                                            Fax:  (202) 616-8470

                                            Attorneys for Respondents