# Exhibit E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JARALLAH AL-MARRI, et al., | : | |
| | : | |
| Petitioners, | : | |
| | : | |
| v. | : | Civil Action No. 04-2035 (GK) |
| | : | |
| GEORGE W. BUSH, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

### MEMORANDUM OPINION

Petitioner, Jarallah Al-Marri, brings this action against Defendants, seeking release from the Guantanamo Bay Naval Station ("GTMO") in Cuba, where he is being detained.[1]  This matter is before the Court on Petitioner's Motion for a Preliminary Injunction and Motion for a Temporary Restraining Order, in which he seeks 30 days' notice before any transfer from GTMO.  Upon consideration of the Motions, Opposition, Reply, and the entire record herein, and for the reasons stated below, Petitioner's Motion for a Preliminary Injunction is **granted**, and Petitioner's Motion for a Temporary Restraining Order is **denied as moot**.

---

[1] Technically, there are two Petitioners in this case, one of whom is Jarallah Al-Marri's Next Friend, who obviously is not subject to transfer from Guantanamo.  All references herein will be to the one Petitioner.

I.    **BACKGROUND**

A.    **Procedural History**

Petitioner, a citizen of Qatar, has been detained at GTMO for more than three years.[2]  On November 10, 2004, he filed a Petition for Writ of Habeas Corpus.  He is one of many GTMO detainees who have filed such petitions in the United States District Court for the District of Columbia since the Supreme Court held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."  Rasul v. Bush, 124 S. Ct. 2686, 2699 (2004).

On November 30, 2004, the Court transferred this case to Judge Joyce Hens Green for coordination and management, as reflected in the September 15, 2004, Resolution of the Executive Session.  On December 28, 2004, Respondents filed a Motion to Dismiss, which became ripe on January 21, 2005.

On January 19, 2005, Judge Richard Leon granted the Government's Motion to Dismiss the detainees' Petition for Writ of Habeas Corpus in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005). On January 31, 2005, Judge Green granted in part and denied in part the Government's Motion to Dismiss in eleven consolidated cases.

---

[2]  Petitioner's counsel has very limited knowledge of Petitioner's precise circumstances.  Counsel has met with Petitioner, but only very briefly and before actual representation began, when counsel was visiting other clients at GTMO. Transcript of Motions Hearing ("Tr.") at 12 (March 30, 2005).  Counsel is scheduled to meet with his client in the very near future.  Id.

In re Guantanamo Cases, 355 F. Supp. 2d 443 (D.D.C. 2005).[3]   The cases before Judges Leon and Green have been fully briefed in the United States Court of Appeals for the District of Columbia and are under submission.

_____On February 3, 2005, Judge Green granted a stay in the eleven cases to which her January 31, 2005, Opinion and Order applied.   On March 8, 2005, this Court stayed the instant case until the Court of Appeals resolves the appeals in Khalid and In Re Guantanamo Cases.[4]

**B.    Transfers from GTMO**

Approximately 540 foreign nationals currently are being held at GTMO.   Decl. of Matthew C. Waxman ¶ 2 ("Waxman Declaration").[5] The Department of Defense ("DOD") states it is conducting a review of each detainee's case, at least annually, to determine whether continued detention is warranted.   Id. at ¶ 3.   Since the Government began detaining individuals at GTMO, the DOD has transferred 211 detainees to other countries.   Id. at ¶ 4.

---

[3] Judge Green's Memorandum Opinion and Order did not apply to eight consolidated cases, including the instant case.   In re Guantanamo Cases, 355 F. Supp. 2d at 452 n.15.

[4] The stay issued in this case does not preclude the Court from considering the merits of the instant Motion.   The stay was entered to preserve the status quo until resolution of issues on appeal in similar cases.   The instant Motion does not require the Court to lift the stay or to adjudicate the case on the merits; rather, it seeks emergency relief to prevent Petitioner's habeas claims from being extinguished and to preserve the status quo. Abdah v. Bush, No. 04-CV-1254, slip op. at 4 (D.D.C. March 29, 2005).

[5] Waxman is the Deputy Assistant Secretary of Defense for Detainee Affairs.   Id. at ¶ 1.

Detainees are subject to two types of transfer: (1) transfer to the custody of another country, with the understanding that they will be released, Tr. at 22-23; and (2) transfer to the custody of another country with the understanding that the country's government has "an independent law enforcement interest" in them and that they likely will face continued detention and processing by that country's judicial system. Id. at 24. In each case, the United States loses all control of the detainees once they are transferred to another country. Waxman Decl. at ¶ 5.

Of the 211 detainees who have been transferred, 146 have been transferred with the understanding that they would be released. Id. at ¶ 7. The Government represents that most of those individuals actually have been released, Tr. at 29, but it cannot provide precise numbers. Id.

Sixty-five detainees have been transferred to the control of other countries for detention. Waxman Decl. at ¶ 7. Of that group, 29 were transferred to Pakistan; 9 to the United Kingdom; 7 to Russia; 5 to Morocco; 6 to France; 4 to Saudi Arabia; and 1 each to Australia, Denmark, Kuwait, Spain, and Sweden. Id..

When transfers for detention are being considered, DOD coordinates with various other Government agencies, including the Department of State ("DOS"). Id. ¶ 6. The Government states that, as a matter of policy, it does not "repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." Id..

4

The Government claims that it ensures compliance with this policy by obtaining "assurances" from officials within the foreign government. The process for obtaining such assurances "involves a frank dialogue, discussion, [and] communication with officials of the other government." Tr. at 32. The Government evaluates the adequacy of the assurances by considering "the identity, position, or other information concerning the official relaying the assurances," Decl. of Pierre-Richard Prosper at ¶ 8 ("Prosper Declaration")[6]; political or legal developments in the country that would provide context for the assurances, id.; and U.S. relations with the country. Id. Senior Government officials ultimately make the final decision on whether to transfer a detainee. Waxman Decl. at ¶ 7. The Government's papers do not indicate which DOD official has this responsibility.

In recent months, a number of newspaper articles about the transfer and treatment of detainees have been published. Petitioner has submitted as exhibits articles quoting current and former employees of the United States government who have been involved in transferring detainees to other countries, including countries that practice torture. See, e.g., Petr.'s Ex. E (Dana Priest, Jet Is an Open Secret in Terror War, Wash. Post, Dec. 27, 2004, at A1). In addition, Petitioner has submitted articles quoting by name former Guantanamo detainees who allege that they

---

[6] Prosper is the Ambassador-at-Large for War Crimes Issues and has supervised the operation of the DOS Office of War Crimes Issues. Id. at ¶ 1.

5

have been moved by the United States government to countries where they have been tortured. See, e.g. Petr.'s Ex. B (Douglas Jehl and David Johnson, Rule Change Lets C.I.A. Freely Send Suspects Abroad, N.Y. Times, Mar. 6, 2005, at A1).

On March 11, 2005, an article in The New York Times reported that DOD plans to transfer "hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan, and Yemen." Douglas Jehl, Pentagon Seeks to Shift Inmates from Cuba Base, N.Y. Times, Mar. 11, 2005, at A1.

In response to this article, several petitioners, including the Petitioner in the instant case, filed motions for temporary restraining orders and preliminary injunctions. On March 12, 2005, Judge Rosemary Collyer granted a request for a temporary restraining order in Abdah v. Bush, No. 04-CV-1254 (D.D.C. March 12, 2005) (order granting temporary restraining order) and denied a similar request in John Does 1-570 v. Bush, No. 05-CV-313 (March 12, 2005) (order denying request for temporary restraining order). On March 29, 2005, Judge Henry H. Kennedy granted a Preliminary Injunction in Abdah.

After the Motions were filed in the instant case, the Government represented to this Court that Petitioner was not scheduled for transfer within the next several weeks. In addition, counsel agreed to a combined hearing on the Motion for Temporary Restraining Order and Motion for Preliminary Injunction. On March 17, 2005, based on those representations, the Court scheduled the hearing on both Motions for March 30, 2005.

## II.  STANDARD OF REVIEW

In considering Petitioner's request for a preliminary injunction, the Court must consider four factors: (1) whether Petitioner would suffer irreparable injury if an injunction were not granted; (2) whether Petitioner has a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. Al-Fayed v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001).[7] "These factors interrelate on a sliding scale and must be balanced against each other." Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

When the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d

---

[7]  The same factors apply when considering a request for a temporary restraining order.  Al-Fayed, 254 F.3d at 303, n.2. However, since the Court has granted the Motion for Preliminary Injunction, it is not necessary to apply these factors to his Motion for Temporary Restraining Order.

738, 740 (2d Cir. 1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." Id. at 844.

## III. ANALYSIS

### A.    Harm to Petitioner

Petitioner argues that he will suffer irreparable harm if transferred to the custody of another country that practices torture or other inhumane treatment of prisoners. Respondents argue that there is no potential harm to Petitioner, because there is no credible evidence that detainees are being transferred to countries that practice torture; instead, any transfers will be largely for purposes of release.[8]

Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." CityFed Fin. Corp., 58 F.3d at 747 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)). To obtain preliminary injunctive relief, Petitioner must show that

---

[8] The Government also argues that transferring Petitioner from United States custody provides him with the very relief he seeks. Tr. at 40.    That argument is overly simplistic, however. Petitioner ultimately seeks total freedom from all custody, not just United States custody. He can only obtain such relief in this litigation if the Court determines that his underlying detention was unconstitutional or illegal. Furthermore, a determination by a United States court that Petitioner is not an enemy combatant might carry significant weight in his home country, thereby facilitating release from custody if he was transferred for continued detention. Finally, on the most human level, proud people have a strong interest in clearing their names from association with acts of violence and terrorism.

the threatened injury is not merely "remote and speculative." Milk
Indus. Found. v. Glickman, 949 F. Supp. 882, 897 (D.D.C. 1996).

In this case, there are two obvious and substantial threats to
Petitioner. First, he faces the possibility of transfer to a
country where he might be tortured or indefinitely confined, which
undeniably would constitute irreparable harm. While the Government
presents declarations that attempt to mitigate these concerns, they
neither refute Petitioner's claims nor render them frivolous.[9]
Indeed, the Government admits that 65 of the 211 detainees
transferred to date have been transferred for detention, not
release. Several of the 65 have been transferred to countries that
our own State Department has acknowledged torture prisoners,
including Pakistan, Saudi Arabia, and Morocco. See Country Reports
on Human Rights Practices -- 2004, available at
http://www.state.gov/g/drl/rls/hrrpt/2004. Finally, the Government
was unable to provide any details about the type or form of
"assurances" given, the scope of the monitoring that takes place
after transfer, or the consequences of noncompliance.[10] Tr. at 32-
33. In short, the threatened injury is not merely remote and
speculative; it is a serious potential threat.

---

[9] The Court notes that the Government's affidavits do not
address the Central Intelligence Agency's involvement in any
transfer or "rendition" programs.

[10] Notably, the Government was also unaware of several other
important facts, such as the availability of extradition treaties
with Qatar or Saudi Arabia, or the consequences if a detainee's
home country refuses to accept him.

Second, Petitioner faces the threat of irreparable harm based on the potential elimination of his habeas claims. It is unclear at this point whether transferring Petitioner would strip this Court of jurisdiction. See Abdah v. Bush, No. 04-CV-1254, Slip op. at 7 (D.D.C. March 29, 2005) (transfer to another country "would effectively extinguish [Petitioner's] habeas claim[] by fiat"); but see Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (holding that an individual detained in Saudi Arabia could survive a motion to dismiss his habeas claim based on the theory of constructive custody). However, given the danger that, upon transfer, the Court could lose jurisdiction to adjudicate Petitioner's claims, it follows that such a transfer could obviate Petitioner's right to "test the legitimacy of [his] executive detention." Lee v. Reno, 15 F. Supp. 2d 26, 32 (D.D.C. 1998). Since such a turn of events would certainly constitute a threat of irreparable harm, an order preserving the status quo in this case is appropriate.[11]

Both threats are imminent. While the Court certainly has relied upon the Government's representations that Petitioner will

---

[11] The Court has the authority to issue such an injunction pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers a district court to issue injunctions to protect its jurisdiction." SEC v. Vison Communications, Inc., 74 F.3d 287, 291 (D.C. Cir. 1996); see also Abdah v. Bush, No. 04-CV-1254, slip op. at 7 (March 12, 2004); Abu Ali, 350 F. Supp. 2d at 54 (quoting Alabama Great S. R. Co. v. Thompson, 200 U.S. 206, 218 (1906)) ("It is well-established that 'the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.'").

not be transferred in the next several weeks, the Government is
clearly maintaining its right to transfer him at any time after the
Court rules upon the instant Motion.  Thus, the threats are not
distant or speculative, and transfer could occur in the near
future.

### B.    Likelihood of Success on the Merits

Petitioner contends that, given Judge Green's Opinion in In re
Guantanamo Cases, he has a substantial likelihood of success on the
merits of his habeas claim.    The Government responds that
Petitioner's claim would be barred because the treaties under which
he seeks review are non-self-executing, and because the review
sought would encroach upon the foreign policy authority of the
executive.

To justify granting a preliminary injunction, Petitioner need
not show "a mathematical probability of success."   Washington
Metro. Area Transit Comm'n, 559 F.2d at 844.   Rather, "it will
ordinarily be enough" that the questions raised are so "serious,
substantial, difficult and doubtful, as to make them a fair ground
for litigation."    Id. (quoting Hamilton Watch Co., 206 F.2d at
740).

The exact chances of success in this case are extremely
difficult to assess.  It is clear, however, that, at a minimum,
Petitioner has raised "fair ground[s] for litigation."  Washington
Metro. Area Transit Comm'n, 559 F.2d at 844.  The issues raised in
these motions are sensitive and involve complex constitutional
questions.  Indeed, there are areas of disagreement even among the

11

judges on this Bench about the legal issues raised in these Petitions. Like the issues in <u>Hamdi v. Rumsfeld</u>, <u>Padilla v. Rumsfeld</u>, and <u>Rasul</u>, there is a strong probability that they ultimately will be resolved by the Supreme Court.

For example, there is disagreement about whether the detainees have any constitutional rights at all. <u>See</u> <u>Khalid</u>, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have no constitutional rights); <u>but see</u> <u>In re Guantanamo Cases</u>, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have some constitutional rights). There is also disagreement over whether the Court will lose jurisdiction over the cases if Petitioner is transferred to another country.[12] <u>See</u> <u>Abdah v. Bush</u>, No. 04-CV-1254, slip op. at 7 (D.D.C. March 29, 2005); <u>but see</u> <u>Abu Ali v. Ashcroft</u>, 350 F. Supp. 2d at 54. And, there is disagreement about whether the Geneva Conventions are self-executing. <u>See</u> <u>Hamdan v. Rumsfeld</u>, 344 F. Supp. 2d 152, 164 (D.D.C. 2004).

In short, even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so "serious, substantial, difficult, and doubtful,"

---

[12]   The Government also argues that the Supreme Court in <u>Rasul</u> failed to protect its jurisdiction over detainees that were transferred. <u>Rasul</u>, 124 S.Ct. at 2690 n.1 (noting that two petitioners had been "released from custody" to the United Kingdom). However, the issue of transfer was not before the Court, and the <u>Rasul</u> petitioners were released to the United Kingdom, not a country known to torture its prisoners. <u>See</u> <u>Country Reports on Human Rights Practices: United Kingdom</u>, available at http://www.state.gov/g/drl/rls/hrrpt/2004/41716.htm ("[t]he [British] Government generally respected the human rights of its citizens").

12

as to make them a "fair ground for litigation."    Washington
Metro. Area Transit Comm'n, 559 F.2d at 844.

    **C.    Harm to Government**

Petitioner argues that there is absolutely no harm to the
Government if it is required to provide the Court and Petitioner's
counsel with 30 days' notice before transferring him to another
country.   The Government contends, however, that there is great
potential harm to its ability to conduct negotiations with foreign
governments regarding the transfer and subsequent release of GTMO
detainees, because such negotiations are often conducted in secret
and divulging their details could seriously impair their success.

The Court fails to see any injury whatsoever that the
Government would suffer from granting the requested preliminary
injunction.   Petitioner requests only 30 days' notice of transfer
-- a narrow and discrete request that would impose no burden on the
Government.   Beyond "vague premonitions" that such relief would
harm the executive's ability to conduct foreign policy, there is no
concrete evidence that such notice actually will intrude upon
executive authority.   Abdah, slip op. at 10 (D.D.C. March 29,
2005).   For example, granting Petitioner's request for 30 days'
notice of transfer would not require the Court to second-guess
foreign policy decisions of the executive, would not require the
Government to divulge information relating to its negotiations with

13

foreign governments, and would not prevent the Government from speaking with one voice.[13]

In weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioner. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioner's claims before this Court.

### D.    Public Interest

Petitioner argues that the public has a strong interest in protecting the constitutional rights of detainees. The Government responds that the requested relief would be contrary to the public interest, because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism.

The Government's argument is unpersuasive, however, for it "simply conflate[s] the public interest with [the Government's] own position," Abdah, 04-CV-1254, slip op. at 11 (March 29, 2005), and asks the Court to accept its predictions of harm without challenge. This the Court is not prepared to do. It is obvious beyond words that there is a strong public interest in the zealous pursuit of those who wish to commit acts of terrorism against the United

---

[13] Such issues could arise if Petitioner ultimately is scheduled for transfer and actually requests additional relief. However, speculation about future requests is no justification for denying the narrow relief requested at this point.

14

States and its citizens. However, the narrow relief sought in this case will not compromise that effort in any way.

In contrast, the public interest undeniably is served by ensuring that Petitioner's constitutional rights can be adjudicated in an appropriate manner. <u>G & V Lounge, Inc. v. Mich. Liquor Control Comm'n</u>, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[i]t is always in the public interest to protect the violation of a party's constitutional rights"). Retaining jurisdiction over this case is essential to protecting that public interest. Thus, the public interest clearly favors entering the preliminary injunction sought by Petitioner.

**V.    CONCLUSION**

Petitioner has requested 30 days' notice of any transfer from GTMO, a concrete, narrow, and minimally burdensome remedy. Based on the Court's analysis of the four relevant factors set forth in the applicable caselaw, it is clear that Petitioner has satisfied his burden. He is faced with an imminent threat of serious harm, which far outweighs any conceivable burden that the Government might face. Furthermore, while it is not possible to demonstrate a "mathematical probability of success," the questions are "serious, substantial, difficult and doubtful." <u>Washington Metro. Area Transit Comm'n</u>, 559 F.2d at 844. Certainly, the Government cannot argue that its success on the merits is a foregone conclusion. Finally, the public interest in granting Petitioner the requested relief is strong. Therefore, for the foregoing

15

reasons, Petitioner's Motion for Preliminary Injunction is **granted,** and his Motion for Temporary Restraining Order is **denied as moot.**

An Order will issue with this Opinion.


April 4, 2005                                          /s/_____
                                              Gladys Kessler
                                              United States District Judge

**Copies to:  Attorneys of Record via ECF**

16